**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

VANESSA COLE, as Personal Representative of the
Estate of ROY LEE RICHARDS, JR., deceased,

      Plaintiff,

      v.

DENNIS HUTCHINS, individually, KENTON
BUCKNER, individually and officially, and the
CITY OF LITTLE ROCK, a municipality,

      Defendants.

Case No. 4:17-CV-553-JLH

***JURY TRIAL DEMANDED***

## COMPLAINT

NOW COMES, Plaintiff, VANESSA COLE, Personal Representative of the Estate of

ROY LEE RICHARDS, JR., deceased, by and through her attorneys, DODDS, KIDD & RYAN

and LAUX LAW GROUP, and for her cause of action, states as follows:

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution, particularly under the

Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871

and 42 U.S.C. § 1983.  This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and

1367.  Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff

complains arose in this District.

## PARTIES

2.      At all relevant times, ROY LEE RICHARDS, JR., ("MR. RICHARDS") was a

citizen of the United States of America and was, therefore, entitled to all legal and constitutional

rights afforded citizens of the United States of America.  On October 25, 2016, and at all relevant times, MR. RICHARDS resided in Little Rock, Arkansas.

3.     Each of the heirs-at-law of MR. RICHARDS, namely, his sister, VANESSA COLE ("PLAINTIFF"), Roy Lee Richards, Sr. (father), J.T. Richards (son) and J.D. Richards (son), are citizens of the United States of America and, therefore, they are entitled to all legal and constitutional rights afforded citizens of the United States of America.  PLAINTIFF is the court-appointed administrator of the Estate of ROY LEE RICHARDS, JR.  *See* Pulaski County Circuit Court Order attached as *Exhibit A*.  PLAINTIFF brings this action on behalf of the estate and on behalf of MR. RICHARDS' heirs-at-law above.

4.     On October 25, 2016, and at all relevant times, DENNIS HUTCHINS ("HUTCHINS"), was employed by the CITY OF LITTLE ROCK ("CITY") as a police officer and was acting under the color of state law, within the scope of his employment.  HUTCHINS joined the Little Rock Police Department ("LRPD") in __.

5.     On June 30, 2014, CHIEF KENTON BUCKNER ("CHIEF BUCKNER"), became the Chief of Police for the LRPD.  Prior to becoming chief of police, CHIEF BUCKNER had more than twenty (20) years of experience in law enforcement, and occupied the positions of supervising sergeant, lieutenant and assistant chief of police with the Louisville Metro Police Department (hereafter "LMPD") in Louisville, Kentucky.

6.     Prior to June 2014, while CHIEF BUCKNER was a supervising officer with the LMPD, the LMPD utilized what is sometimes called a "liar's list," meaning that the LMPD affirmatively provided a list of police officers who have been found to be untruthful to prosecutors and defense attorneys.  At all relevant times, CHIEF BUCKNER and Thomas were

2

aware of the holding of *Brady v. Maryland*, and their respective duty as chief of police to alert prosecutors to officers who have demonstrated untruthfulness during official police business.

7.     On October 25, 2016, and at all relevant times, CHIEF BUCKNER was employed by the CITY, and acted under the color of state law.  At all relevant times, CHIEF BUCKNER had the ultimate responsibility within the LRPD for the protection of life, the upholding of the United States Constitution, the preservation of law and order, the investigation of all crimes and the enforcement of the laws of the State of Arkansas and city ordinances.

8.     On October 25, 2016, and at all relevant times, CHIEF BUCKNER had final policy-making authority in terms of creating, adopting and/or implementing LRPD General Orders ("GOs").  At all relevant times, CHIEF BUCKNER was responsible for assuring the enforcement of LRPD GOs, Rules & Regulations ("Rules") and Divisional Operational Procedures ("DOPs") (collectively "policy" or "policies") among LRPD officers.

9.     As Chief of Police of LRPD, and pursuant to the authority vested in him, CHIEF BUCKNER was empowered to initiate procedural changes to address or remedy any negative trend or pattern that he identified within the LRPD upon becoming chief.  For instance, at all relevant times during his tenure as chief, CHIEF BUCKNER had the authority to order that all police-involved shootings by members of the LRPD be criminally investigated by an independent law enforcement agency, such as the Arkansas State Police.

10.    Prior to October 25, 2016, and at all relevant times, CHIEF BUCKNER, and his immediate predecessor, Stuart Thomas ("Thomas"), had the authority to terminate for cause the employment of HUTCHINS with the LRPD.  As Chief of Police of LRPD, CHIEF BUCKNER was empowered to discipline HUTCHINS and even terminate his employment, if he felt that HUTCHINS was untruthful in any material way about the shooting of MR. RICHARDS.

11.     On October 25, 2016, and at all relevant times, the CITY was a municipality organized and existing under the laws of the State of Arkansas.  At all relevant times, the CITY was located in the County of Pulaski, State of Arkansas, and was the employer of the individually-named Defendants.  At all relevant times, the LRPD was a subdivision within the municipality which is the CITY.  At all relevant times, the CITY is and was empowered, funded and directed to pay any § 1983 civil rights judgment for compensatory damages, actual damages and attorney fees for which any CITY employee acting within the scope of his or her employment is found liable.  Accordingly, the CITY is an indemnification party regarding the acts and/or omissions of which PLAINTIFF complains.

12.     On October 25, 2016, and at all relevant times, the CITY participated in the Municipal Legal Defense Program which is offered by the Arkansas Municipal League to Arkansas towns and cities.  The acts and/or omissions of which PLAINTIFF complains constitute a civil rights lawsuit against the CITY and the individually-named defendants.  The Arkansas Municipal Legal is a primary or secondary indemnification party regarding the acts and/or omissions of CITY and the individually-named defendants of which PLAINTIFF herein complains.

## PERTINENT LRPD POLICIES AND CUSTOMS

13.     On October 25, 2016, and at all relevant times, all LRPD patrol officers were required to be apprised of the Fourth Amendment of the United States Constitution, and were required, at all times, to follow the United States Constitution, the laws of the State of Arkansas and to comply with LRPD policies.  LRPD GOs are written orders issued by the Chief of Police which apply to all Departmental employees, including LRPD police officers such as HUTCHINS and LRPD investigators.

**LRPD General Order 303**
*(Use of Force)*

14.     On October 25, 2016, and at all relevant times, GO 303 (*Use of Force*) was in

effect, and contained the LRPD's "Statement of Philosophy" pertaining to deadly force, which

reads in part as follows:

> "The Little Rock Police Department in establishing a philosophy
> for the use of Deadly Force places the ultimate value on human
> life, while considering the legal, moral and ethical implications of
> its application.
>
> The citizens of Little Rock have vested their police officers with
> the responsibility to protect life and property, and to apprehend
> criminal offenders.
>
> *****
>
> Police Officers are confronted daily with situations where control
> must be exercised to effect arrests and to protect the public safety.
> The officers may achieve control of situations by the use of verbal
> warnings or the use of reasonable physical force.  The use of any
> reasonable physical force must be based on reasonable alternatives
> that have been considered and would be ineffective.  The use of
> Deadly Force shall be the last alternative, and the officer's
> responsibility to protect human life must include his own."

15.     A section entitled "Avoiding the Use of Deadly Force" also is found in GO 303,

and it reads as follows:

> "Regardless of the nature of a crime or the justification for
> directing Deadly Force at a suspect, officers must remember that
> their basic responsibility is to protect life.  Officers shall not fire
> their weapons under conditions that would unnecessarily subject
> bystanders or hostages to death or possible injury, except to
> preserve life or to prevent serious physical injury.  Deadly Force is
> an act of last resort and will be used only when other reasonable
> alternatives are impractical or have failed.
>
> Officers will plan ahead and consider alternatives which will
> reduce the possibility of needing to use Deadly Force."

16.     Historically, when an LRPD officer has killed a Little Rock citizen within the scope of the officer's employment, per GO 303, the LRPD performs an "in-house" criminal investigation of the homicide.  The performing of in-house criminal investigations of LRPD police-involved shootings by the LRPD Detective Division means that, in such instances, members of the LRPD are responsible for building a criminal case against their friends, acquaintance and/or co-workers, should the evidence support a criminal case.

17.     When the LRPD does in-house criminal investigations of LRPD officers who have killed Little Rock citizens, the Crime Scene Search Unit ("CSSU"), which is under the authority of the chief of police, is responsible for identifying, preserving and/or collecting physical evidence for transmission to the Arkansas State Crime Laboratory for further scientific review and analysis.

18.     GO 303 also provides for an Internal Affairs Division ("IAD") Investigation whenever a LRPD officer has used deadly force, the purpose of which is to evaluate whether LRPD policies were followed in the underlying shooting, as well as during the subsequent criminal investigation performed by the LRPD.  GO 303 further provides for a Deadly Force Review Board ("DFRB") to review all police-involved shootings resulting in injury or death by sworn members of the LRPD, while in the performance of their duties as police officers.

19.     At all relevant times, it was the practice of CHIEF BUCKNER and Thomas, and each of them, to review all investigation files generated by the LRPD pertaining to allegations of police misconduct and police-involved shootings during their respective tenures as chief.  At all relevant times, the DFRB reported directly to CHIEF BUCKNER and Thomas, and each of them, providing notice of the DFRB's findings and recommendations during their respective tenures as chief.

**LRPD General Order 211**
(*Internal Investigations, Citizen Complaints, and Disciplinary Actions*)

20.     At all relevant times, per GO 211 (*Internal Investigations, Citizen Complaints, and Disciplinary Actions*), the chief of police is responsible for the proper handling of citizen complaints against LRPD officers.  Per GO 211, the IAD is responsible for the investigation of all complaints against department employees involving serious misconduct, including police-involved shootings, the use of deadly force, in-custody deaths, excessive force/brutality/physical abuse and the violation of any criminal statute.  Per GO 211, the Office of the Chief of Police reviews all IAD investigation files.  Per GO 211, the chief of police determines the final disposition and any disciplinary action in IAD investigations.

21.     At all relevant times, GO 211 provided for an Early Intervention System ("EIS"), which is a database management tool designed to identify officers whose performance shows problems and to provide interventions to correct those problems. One of the reasons that LRPD utilizes the EIS is to identify an officer's performance patterns before they get to the level of complaints or lawsuits.  The intent of the EIS at the LRPD "is to ensure that the Little Rock Police Department is not faced with a serious case of misconduct that reveals an escalating pattern of misconduct that could have been abated through earlier intervention."

22.     At all relevant times, per GO 211, each first-line supervisor is required to maintain an EIS file on each employee assigned to his or her command.

23.     At all relevant times, it was the practice of CHIEF BUCKNER and Thomas, and each of them, to receive notice of all EIS alerts triggered by their officers, during their respective tenures as chief.

**LRPD General Order 204**
**(*Firearms and Ammunition Regulations*)**

24.     On October 25, 2016, and at all relevant times, GO 204 (*Firearms and Ammunition Regulations*) required that LRPD officers carry a department-issued .40 caliber semi-automatic pistol as their on-duty service weapon.  Per GO 204, on-duty LRPD officers are required to keep a round in the chamber of their service weapon and to keep the magazine fully loaded at all times while on duty.

25.     On October 25, 2016, and at all relevant times, GO 204 authorized specialized weapons (such as rifles and fully-automatic weapons) other than service weapons for those employees who were qualified with, and whose assignments required, such weapons.  Per GO 204, the need for specialized weapons is determined by the chief of police.

26.     On October 25, 2016, and at all relevant times, GO 204 provided that officers may carry one (1) approved secondary firearm in conjunction with, and as a back up to, the officer's primary departmentally issued or approved firearm.  Per GO 204, ammunition for secondary firearms must conform to the same guidelines as departmentally issued ammunition. GO 204 further states that:

> **"[t]he secondary firearm is to be viewed only as a weapon of last resort** and the use of a secondary firearm **will be limited to** those instances where an officer's use of deadly force is authorized under this General Order **and the officer's primary firearm had been:**
>
>> 1.     **Lost, stolen, or rendered inoperable** during the course of the specific incident authorizing the use of deadly force;
>>
>> 2.     **Exhausted of ammunition** under circumstances which clearly limit the officer's ability to immediately reload; or,

3.      **When an act of an assailant(s) prevents the officer from being able to employ his primary weapon** in a situation where deadly force is authorized in General Orders.  (For example, when an officer is being disarmed or is in the process of being disarmed by assailant(s))." (emphasis added)

**LRPD Rule 1/8003.00**
***(Officers shall be truthful at all times, whether under oath or not, when conducting official police business)***

27.      Rule 1/8003.00 (*Officers shall be truthful at all times, whether under oath or not, when conducting official police business*) was in effect on October 25, 2016, and at all relevant times, and on-duty LRPD officers are required not to violate Rule 1/8003.00 at any time.  Rule 1/8003.00's requirement of truthfulness applies to officers' statements and official reports.

28.      During a discovery deposition in August 2016 in another matter, Thomas acknowledged that LRPD investigations determined that seventy-nine (79) LRPD officers were untruthful during official police business but were not terminated despite their proven untruthfulness.  At his deposition, Thomas acknowledged that the list of 79 lying officers was "a pretty long list."   Thomas did not affirmatively notify prosecutors of officers who have demonstrated untruthfulness during official police business during his tenure as chief of police.

29.      At all relevant times, CHIEF BUCKNER has not affirmatively notified prosecutors of all officers who have demonstrated untruthfulness during official police business.

## BACKGROUND FACTS

30.      On October 25, 2016, at approximately 12:35 a.m., the CITY's Dispatch Department received a call regarding an incident at 514 E. 8th Street, wherein the caller stated that there was an individual with a "long" gun outside the residence at 514 E. 8th Street.

31.     On October 25, 2016, around that time., Derrell Underwood ("Mr. Underwood") called the CITY's Dispatch Department, reporting that his nephew (MR. RICHARDS) was drunk and in his yard, and Mr. Underwood was trying to get MR. RICHARDS to leave his house.  While talking to the CITY's Dispatch Department, Mr. Underwood stated "…Now don't hurt him, I just want him outta my yard and, away from my house."

32.     *Exhibit B*, which is a Google Map ™ screenshot, is an image of the front of Mr. Underwood's residence at 514 E. 8th Street, taken from the south of the residence, facing north.

33.     HUTCHINS and Officer Juston Tyer ("Tyer") responded to the calls.  While en route, HUTCHINS announced via radio that he was going to deploy his rifle, which was a Black Bushmaster .223 caliber (5.56mm) rifle, and which he has described as an "AR-15 style" rifle. HUTCHINS never received the approval of any superior officer prior to deploying his Black Bushmaster .223 caliber (5.56mm) rifle ("assault rifle").

34.     HUTCHINS and Tyer parked their marked LRPD vehicles on S. Commerce Street ("Commerce"), facing north, to the west of a wooden fence, at the northwest corner of Commerce and 8th Street.

35.     *Exhibit* C is two (2) pages in length and consists of two (2) documents.  Page One of *Exhibit C* is a is a Google Map ™ screenshot which depicts the wooden fence on the corner of Commerce and 8th Street, taken from south of 8th Street, facing north.  Page Two of Exhibit C is a CSSU overhead diagram of the corner of Commerce and E. 8th Street.

36.     Based on the two-page *Exhibit C*, Mr. Underwood's residence at 514 8th Street is to the east–or to the right–of the corner of the wooden fence depicted in *Exhibit C*.  The address of the house which is depicted on Page One of *Exhibit C* and is situated at the end of Commerce,

to the left of the depicted white car, is 500 E. 8th Street, which is three (3) doors west of Mr. Underwood's residence at 514 E. 8th Street.

37.     After he parked and exited his vehicle, armed with his assault rifle, HUTCHINS traveled on foot northbound on Commerce, looked east, and observed two (2) males involved in a physical altercation on the front lawn of 514 E. 8th Street, which was on the north side of the street.  HUTCHINS reported his observation to Tyer at that time, stating "they're fighting."

38.     Provided there is no valid consent between the involved parties, a physical altercation or fist fight, as HUTCHINS described it, between those parties potentially constitutes battery in the second degree, which is a Class D felony per Arkansas Code § 5-13-202, by one or both of the parties.

39.     Though neither HUTCHINS nor Tyer knew their names at that time, the two (2) males observed by HUTCHINS were Mr. Underwood and MR. RICHARDS.

40.     Neither HUTCHINS nor Tyer announced their presence in regard to the physical altercation that HUTCHINS observed.  Neither HUTCHINS nor Tyer told Mr. Underwood or MR. RICHARDS to "break it up" or to end the altercation.

41.     At the time HUTCHINS observed the physical altercation between Mr. Underwood and MR. RICHARDS, HUTCHINS did not see any gun in the possession of MR. RICHARDS.

42.     At the time HUTCHINS observed the physical altercation between Mr. Underwood and MR. RICHARDS, MR. RICHARDS did not have a gun in his possession.

43.     HUTCHINS and Tyer continued traveling on foot northbound on Commerce, crossed 8th Street, and began to travel eastbound toward 514 E. 8th Street, on the sidewalk on the north side of the street.

11

44.     While HUTCHINS and Tyer traveled eastbound on the sidewalk on the north side of 8th Street, Mr. Underwood's residence at 514 E. 8th Street would have been directly ahead and slightly to north of HUTCHINS and Tyer.

45.     While HUTCHINS was on the sidewalk on the north side of 8th Street, approximately 75-80 feet away from the residence at 514 E. 8th Street, and while MR. RICHARDS was on the front lawn of that residence, HUTCHINS fired his assault rifle at MR. RICHARDS multiple times, striking him and killing him.

46.     According to Tyer, MR. RICHARDS fell face down on the ground after he was shot.  According to Tyer, an air rifle was on the right side of MR. RICHARDS' body when Tyer approached the front yard of 514 E. 8th Street.

47.     According to the CSSU Report, MR. RICHARDS was found by CSSU personnel in the front yard of 514 E. 8th Street, with his head "directed southwest while the feet were directed northeast," as depicted on *Exhibit D*, which is a CSSU Overhead Diagram.

48.     According to the CSSU Report, MR. RICHARDS suffered two (2) apparent gunshot wounds: "one to the back of the right ankle and one to the right ear."

49.     According to the CSSU Report, CSSU personnel found five (5) shell casings from HUTCHINS' firearm "[o]n the north side of E. 8th Street, southwest of residence at 512," as depicted in *Exhibit D*.

50.     According to the CSSU Report, CSSU personnel discovered "[p]ossible projectile strikes" to the residence at 516 E. 8th Street, which is to the immediate east of 514 E. 8th Street, describing the locations of the possible projectile strikes as follows:

- A:  Trim on west side of front porch of residence at 516 E 8th Street; and

- B:  West side of front porch of residence at 516 E 8th Street.

51.     While shooting at MR. RICHARDS, HUTCHINS struck the residence at 516 E. 8th Street with the bullets from his assault rifle, causing damage to the exterior of Mr. Underwood's next-door neighbors' residence.

52.     According to the CSSU Report, CSSU personnel recovered twenty-one (21) live rounds from HUTCHINS firearm.

53.     Per GO 303, the LRPD conducted their in-house criminal investigation of the shooting, which means that members of the LRPD–who are HUTCHINS' co-workers and fellow LRPD officers–were responsible for building a criminal case against HUTCHINS should the evidence support a criminal case.

**Eyewitness Charles James**

54.     On October 25, 2016, at approximately 2:29 a.m., LRPD investigators questioned Charles James about the incident.  Mr. James told investigators that he lived directly across the street from 514 E. 8th Street.  He told investigators that he "looked out [his] window which is right looking straight down on the, on the front porch [of 514 E. 8th Street]…"

55.     Mr. James was an eyewitness to the shooting of MR. RICHARDS.

56.     Mr. James told investigators that he never saw any police vehicles prior to the shooting, and described the actions of HUTCHINS and Tyer when he first observed them as "sneaking up."

57.     Mr. James described the moments preceding the shooting, and the shooting itself as follows:

> "…**[MR. RICHARDS] came to the, to the [car] door that's open right there, got something outta the car, rifle, and walks up the first couple stairs [Mr. Underwood] bee-lined it into the house, closed the door, [MR. RICHARDS] turned around like this and walked down the couple steps** and I looked over here

and the Cops were creeping up between those two cars right there
on the sidewalk and **blam, blam, blam the five, six shots, seven
shots and [MR. RICHARDS] just went down.  That was it.**"
(emphasis added)

58.     Mr. James told investigators that the shooting officer "crept up to about, about the

front a (sic) that car and started firing."

59.     Mr. James told investigators that he heard as many as seven (7) gunshots.

60.     Mr. James was asked about the location of the officers when the shooting began,

and he responded: **"Not, not there where the light is – over here where it's absolutely dark."**

61.     Mr. James confirmed with investigators that he "was actually watching from [his]

upstairs window."  Mr. James described his location at the time of the shooting as "[j]ust right on

top of it."

62.     Mr. James told investigators his belief that MR. RICHARDS did not see the

police before shots were fired.

63.     Mr. James told investigators that Mr. Underwood was inside his home with the

front door closed behind him prior to any shots being fired.

64.     Mr. James told investigators that after Mr. Underwood entered his house and shut

the front door, MR. RICHARDS came down the steps.

65.     Mr. James told investigators that **Mr. Underwood "you know slams the door,

[MR. RICHARDS] just backed up a couple of steps and came down like this and that they

immediately shot him."**  (emphasis added)

## Eyewitness Lisa Hunt

66.     On October 25, 2016, at approximately 2:55 a.m., LRPD investigators questioned

Lisa Hunt about the incident.  Ms. Hunt told investigators that she lived across the street from

14

514 E. 8th Street.  She told investigators that she saw "two Officers approaching um, from the west and…They are, they were on a sidewalk."

67.     Ms. Hunt told investigators that she saw the two officers on the north side of 8th Street, in dark clothing, with their weapons drawn.  She told investigators that she did not hear the officers announce their presence.  She told investigators that she heard gunfire "and another neighbor I heard yell multiple times please stop shooting."

**Eyewitness Michael Stotts**

68.     On October 25, 2016, at approximately 3:56 a.m., LRPD investigators questioned Michael Stotts about the incident.  Mr. Stotts told investigators that he lived at 512 E. 8th Street, which is immediately west of 514 E. 8th Street.  He described MR. RICHARDS' approach with the gun to the residence as follows:

> "Yeah he was he was I wasn't sure how fast [MR. RICHARDS] was walking but he was he was walking from the vehicle and **he had it aimed at [Mr. Underwood]'s house.  Which I didn't see where [Mr. Underwood] was exactly.**  But it was in that direction."  (emphasis added)

69.     When Mr. Stotts saw MR. RICHARDS with a gun in his possession, walking toward 514 E. 8th Street, he could not see Mr. Underwood.

**Witness Kelvin Jenkins**

70.     On October 25, 2016, at approximately 4:06 a.m., LRPD investigators questioned Kelvin Jenkins about the incident.  Mr. Jenkins told investigators that he was inside Mr. Underwood's residence at 514 E. 8th Street at the time of the shooting.  He told investigators that Mr. Underwood also was inside of the residence at 514 8th Street at the time of the shooting.

**Witness Derrell Underwood**

71.     On October 25, 2016, at approximately 4:26 a.m., LRPD investigators questioned Mr. Underwood about the incident.  Mr. Underwood confirmed that he was involved in the physical altercation that HUTCHINS observed.  He told investigators that when he was in the altercation with MR. RICHARDS, MR. RICHARDS did not have a gun.

72.     Mr. Underwood told investigators that he had pinned MR. RICHARDS on his front lawn, but then released MR. RICHARDS, stood up and walked back into his residence at 514 E. 8th Street.  He told investigators that as he began to walk up his front porch steps, he saw MR. RICHARDS pulling a gun from out of his truck.

73.     Mr. Underwood told investigators that he entered his home, locked his front door, turned and was walking toward his kitchen when he heard gunshots outside.

74.     Mr. Underwood told investigators that he believed that MR. RICHARDS' shooting could have been avoided.

75.     After Mr. Underwood told LRPD investigators that he thought the shooting could have been avoided, the LRPD investigators did not explore the basis of Mr. Underwood's belief, and then ended their questioning.

76.     The end of Mr. Underwood's questioning by LRPD investigators proceeded as follows:

>        UNIDENTIFIED INVESTIGATOR:        Um-kay.   **Alright, Mr. Underwood, there uh, is there anything else you'd like to add to this statement about what happened?**
>
>        MR. UNDERWOOD:        Uh, and I mean this is, **man all this coulda been avoided.**
>
>        UNIDENTIFIED INVESTIGATOR:        Um-kay.

> MR. UNDERWOOD:        Cause if I'd just walked and went in the house and just let him its there man, it's not…
>
> UNIDENTIFIED INVESTIGATOR:        **Detective Moore, do you have anything?**
>
> MOORE:        **No.**
>
> UNIDENTIFIED INVESTIGATOR:        **If there's nothing else we'll go ahead and conclude this statement.**  The time is now 4:40 a.m. (emphasis added)

77.     After Mr. Underwood told LRPD investigators that he thought the shooting of MR. RICHARDS could have been avoided, the investigators never asked him why he thought the shooting could have been avoided.

### **DEFENDANT DENNIS HUTCHINS and Officer Juston Tyer's Official Police Reports**

78.     After the shooting, but prior to giving any statements to LRPD investigators, HUTCHINS and Tyer each drafted official officer's reports regarding the shooting.  Because HUTCHINS and Tyer's reports were each completed prior to their respective statements, they were available to LRPD investigators during the statements, in the event the investigators wished to use them to point out any inconsistencies in the statements or challenge any facts alleged during the statements.

79.     In his October 25, 2016 Officer's Report, HUTCHINS reported:

> "Upon approach, **I observed two black males fist fighting in the yard at 514 E. 8th Street.**  The black males stopped fighting and one of them walked out of my view to a dark colored SUV that was parked next to 8th Street, while the other watched.  I then noticed that the subject that was standing in the yard began running toward the front porch of 514 E. 8th Street.  **When the suspect came back into my view, he was chasing the subject while pointing a long gun at the subject's back.  At that point, I fired multiple rounds at the suspect because I thought he was going to shoot the subject in the back.**"  (emphasis added)

80.     In his October 25, 2016 Officer's Report, Tyer reported that after he and HUTCHINS exited their vehicles, HUTCHINS advised him that he could see two males fighting in the front yard of 514 E. 8ᵗʰ Street.

81.     In his Officer's Report, Tyer further reported:

> "We then proceeded north from the intersection and crossed E. 8ᵗʰ St. and walked onto the north side sidewalk. We then proceeded to turn east and head to the incident location. When coming onto the side I observed a black male standing near the rear of a small suv in the front yard of the location we were heading to. I then saw this black male take north bound heading toward the front stairs of the incident location in a fast pace. **I then noticed this black male had a rifle in his right hand down by his leg. I was able to determine it was a long looking gun because it was being held vertical along the leg. At this point I raised my rifle to fire at the suspect because I was worried he was going into the house to shoot someone with the rifle.** When I raised my rifle I observed that my scope had not turned on when I was exiting my vehicle like I thought it had. **At this point Ofc. HUTCHINS fired approximately 3-4 times,** and the suspect fell in the yard approximately 12 feet from the back of the suv." (emphasis added)

82.     Other officers drafted official officer's reports regarding their involvement in responding to the shooting. In his October 25, 2016 Memorandum, Sgt. Jarrod Purifoy stated that HUTCHINS and Tyer "announced over the radio that they would be deploying their patrol rifles." He further stated **"[b]efore I could acknowledge via the radio that I approved of them deploying their rifles, Officer HUTCHINS advised that shots were fired and a subject was down."** (emphasis added)

83.     In his October 25, 2016 Officer's Report, Officer Ryan Bewley stated that Mr. Underwood informed him that Mr. Underwood was "inside the residence when he heard a gunshot." This statement by Mr. Underwood to Officer Bewley was made prior to Mr. Underwood's statement to LRPD investigators.

## DEFENDANT DENNIS HUTCHINS' Official Statement To LRPD Investigators

84.     On October 25, 2016, at approximately 5:04 a.m., LRPD investigators questioned HUTCHINS about the incident.

85.     According to HUTCHINS, one of the individuals involved in the physical altercation (MR. RICHARDS) got up and walked toward a black SUV, while the other individual (Mr. Underwood) stood there watching.

86.     HUTCHINS told investigators:

> "I was approaching from the west.  [MR. RICHARDS] was east of me on the other side of the vehicle so when he went back to his car I lost sight of him for a second but I could hear him dig around the car and I didn't know at that point whether he you know, was he getting in the car to leave or what he was doing."

87.     HUTCHINS told investigators that he then saw Mr. Underwood begin to run toward the residence at 514 E. 8th Street.

88.     HUTCHINS told investigators that MR. RICHARDS was running northbound, toward the front porch of the residence at 514 E. 8th Street when HUTCHINS fired his weapon at MR. RICHARDS.

89.     HUTCHINS told investigators:

> "...[A]s we started approaching I seen two subjects, two black males fighting in the front yard of what ended up being 514 E. 8th. They fight briefly and then they got up and one of 'em walked towards a black SUV or dark colored SUV and the other one was just kinda standing there watching him for a second and so he, he kinda went outta my view and I wuddn't (sic) sure at that point if okay, is this thing over you know, is he leaving now or what he was doing but I noticed the, the guy that was just standing there turn and, and start running for the door and **at that point the guy that had been at his car or his SUV came back into my view and he had a long rifle and he was chasing after the guy and had it, had it pointed at his back and when I seen that I thought he's gonna I mean, he's gonna kill this guy right here**

19

**in front of me um, so I fired, I fired my patrol rifle and, and uh, he went down."** (emphasis added)

90.    HUTCHINS told investigators:

"And uh, of course you think why is this guy you know, is he running from us, is he running – what's he running from and at that point I mean, **to my horror this guy emerges from the other side a (sic) the SUV with a long rifle and he's I mean, he's chasing him….With uh, with the gun up at him and chasing him up into the house, so.**"

91.    HUTCHINS did not give any verbal commands when he observed MR.

RICHARDS in possession of the gun.  HUTCHINS did not say anything when he observed MR.

RICHARDS in possession of the gun.

92.    HUTCHINS was asked why he fired his weapon, and he responded:

**"Because I thought he was gonna shoot that guy in the back.  I, I really…I thought he was gonna kill that guy right there in front a (sic) me.**  it – the way he was I mean, you could tell that uh, uh, by his body language that he was, he was mad and he was uh, you know, he was coming at him." (emphasis added)

93.    HUTCHINS described MR. RICHARDS' actions at the time he fired his weapon:

"He was um, yeah let's see, he, **he had the, the rifle pretty much pointed at the guy's back, he had it elevated kinda pointed at his back and was running after him and the guy was obviously trying to get away, he was scared and trying to get back to the door.**  I guess to the safety of his house but this guy, I mean, he was on him you know, he was…" (emphasis added)

94.    HUTCHINS told investigators: "**The one that was doing the chasing with the**

**rifle, he was – when I fired he was approaching the bottom a (sic) the stairs to go up onto**

**the porch.**" (emphasis added)

95.    HUTCHINS told investigators that when he fired his weapon, MR. RICHARDS

was facing the porch of the residence at 514 E. 8th Street.

96.     HUTCHINS told investigators that when he fired his weapon, MR. RICHARDS had not yet reached the front porch steps of 514 E. 8th Street.

97.     HUTCHINS told investigators that he was not sure how many rounds he had in his weapon at the time he shot and killed MR. RICHARDS.  HUTCHINS told investigators that he was unsure how many rounds he fired at MR. RICHARDS.  HUTCHINS affirmed to investigators his opinion that it was "common practice" to carry a firearm without it being fully loaded.

98.     HUTCHINS did not attempt to communicate with MR. RICHARDS at any time prior to firing his weapon.

99.     HUTCHINS told investigators that there was no one else out on the street when he fired his weapon at MR. RICHARDS.

100.    At no time during the criminal investigation did HUTCHINS ever state to LRPD investigators that he fired his assault rifle at MR. RICHARDS because he was fearful for his life or the life of Tyer.

**Officer Juston Tyer's Official Statement To LRPD Investigators**

101.    On October 25, 2016, at approximately 4:23 a.m., LRPD investigators questioned Tyer about the incident.

102.    Tyer told investigators that at the time that HUTCHINS fired his weapon, MR. RICHARDS was running northbound at a slight angle toward the stairs of the front porch of 514 E. 8th Street.

103.    Tyer told investigators he could see the rifle in MR. RICHARDS' right hand, which was on the opposite side of MR. RICHARDS' body from Tyer's perspective.

104.    Tyer told investigators:

21

"**Um but I mean I you know when he turned and was running towards the house I mean I could see that silhouette of the, of the gun**…Oh yeah.  Yeah I mean I you know like I said he was you know he was – I, I could see his profile side because he was kinda running.  You know the, he, you know this being his front and this being his rear.  He was running like this…**And I mean I could see that gun on his opposite side of his body in his right [hand].**"  (emphasis added)

105.    Tyer told investigators:

"Yes [HUTCHINS] relayed he, he said hey man they're, they're, they're fighting in this yard right now.  And uh and so like I said when, when we got around the corner I guess the fighting had stopped by that time.  **And maybe the other guy had run up in the house** and then the suspect was you know when we came around because there was cars lined up.  **And then when we stepped up on the side walk the north of the road that little sidewalk right there that's when I saw the guy coming from the back of the car with the rifle in his hand.  And was running towards the stairs.**"  (emphasis added)

106.    Tyer told investigators that it was possible that Mr. Underwood was inside his home when HUTCHINS opened fire.

107.    Tyer told investigators that he raised his weapon at the same time as HUTCHINS, but he did not shoot because his scope did not turn on.

108.    Tyer did not attempt to communicate with MR. RICHARDS at any time.

109.    Tyer was asked about MR. RICHARDS' actions at the time shots were fired, and he responded: **"Well he was headed towards the stairs.  He, he didn't he wasn't able to make it."** (emphasis added)

110.    Tyer told investigators that MR. RICHARDS fell face down after the shooting.

111.    Tyer told investigators that the gun was in MR. RICHARDS' right hand, on the opposite side of his body, right before he fell to the ground face down.  Tyer told investigators as

he approached MR. RICHARDS, the gun was still in MR. RICHARDS' right hand, laying on the right side of his body.

112.    Tyer told investigators that he "grabbed and moved" the gun from near the right side of MR. RICHARDS' body after the shooting.  Tyer told investigators that he thought HUTCHINS "ended up kicking [the gun] further" or "ended up moving [the gun] further away."

113.    Tyer told investigators that he performed chest compressions on MR. RICHARDS until he was relieved by Officer Barry Kingston.

114.    In order to perform chest compressions on MR. RICHARDS, Tyer had to roll MR. RICHARD over onto his back.

115.    Tyer told investigators that he and HUTCHINS looked for HUTCHINS' shell casings after the shooting but before CSSU personnel arrived.

### Material Discrepancies, Major Irregularities And Incriminating Facts Never Acknowledged Or Addressed By LRPD Investigators

116.    LRPD investigators took statements from HUTCHINS and Tyer after the statements of Mr. Underwood, Mr. James, Ms. Hunt, Mr. Stotts and Mr. Jenkins.  Therefore, the investigators had the opportunity to question HUTCHINS and Tyer specifically about the statements of Mr. Underwood, Mr. James, Ms. Hunt, Mr. Stotts and/or Mr. Jenkins, and to use those statements to point out any inconsistencies in the statements of HUTCHINS and Tyer or challenge any facts alleged by HUTCHINS and Tyer.

117.    The account of the shooting that HUTCHINS gave to LRPD investigators reflects that HUTCHINS shot MR. RICHARDS while MR. RICHARDS was pointing a long gun at Mr. Underwood's back, and while MR. RICHARDS and Mr. Underwood were both outside.

118.    The accounts given by Mr. Underwood, Mr. James and Mr. Jenkins generally reflect that Mr. Underwood was inside the residence at 514 E. 8th Street, and MR. RICHARDS was outside that residence, when HUTCHINS shot MR. RICHARDS.

119.    According to Mr. James, after Mr. Underwood went inside his home and shut the front door, MR. RICHARDS descended Mr. Underwood's front porch steps in a southwardly direction, and was then shot by HUTCHINS.

120.    After the statements of Mr. Underwood, Mr. James, Ms. Hunt, Mr. Stotts and Mr. Jenkins, and in spite of those statements, the LRPD released an official press statement regarding the shooting, an excerpt of which reads:

> "…Once Richards came back into officers' view, **they observed Richards begin to chase the other black male while pointing a long gun at his back.  At that point, Officer Dennis Hutchins stated that he fired multiple rounds** at Richards from his authorized service weapon, striking Richards, because **he believed that Richards was going to shoot the other black male in the back**…" (emphases added)

121.    LRPD investigators never asked HUTCHINS if Mr. Underwood was inside his residence when HUTCHINS began shooting at MR. RICHARDS.

122.    LRPD investigators never asked HUTCHINS if MR. RICHARDS was descending Mr. Underwood's front porch steps, or had already descended the steps, when HUTCHINS began shooting at MR. RICHARDS.

123.    LRPD investigators never asked HUTCHINS if MR. RICHARDS was actually backing up southwardly, away from Mr. Underwood's residence when HUTCHINS began shooting.

124.    LRPD investigators never asked HUTCHINS if he if he had time to issue a warning to MR. RICHARDS before he shot MR. RICHARDS.  LRPD investigators never asked

HUTCHINS why he did not issue a warning to MR. RICHARDS before he shot MR. RICHARDS.

125.     LRPD investigators never asked Tyer to elaborate on his stated belief that it was possible that Mr. Underwood was inside his residence at the time that HUTCHINS shot MR. RICHARDS.

126.     The CSSU determined that MR. RICHARDS was shot on the right side of his head.  MR. RICHARDS' autopsy report indicates that he was shot on the left side of his head.  The CSSU's determination of the location of MR. RICHARDS' head gunshot injury is inaccurate.

127.     HUTCHINS was in a darkened area of the north side of 8th Street when he fired his assault rifle at MR. RICHARDS.

128.     MR. RICHARDS was shot by HUTCHINS after Mr. Underwood had already entered his home.

129.     MR. RICHARDS was shot by HUTCHINS after Mr. Underwood had shut the front door to his home.

130.     MR. RICHARDS was shot by HUTCHINS after MR. RICHARDS descended Mr. Underwood's front porch steps.

131.     MR. RICHARDS was shot by HUTCHINS while traveling southward, away from Mr. Underwood's residence.

132.     After MR. RICHARDS was shot by HUTCHINS, MR. RICHARDS fell to the ground face first, with his head pointing in a southward direction.

133.     MR. RICHARDS was not "pointing a long gun at [Mr. Underwood's] back" at the time HUTCHINS fired his assault rifle at MR. RICHARDS.

134.    The gun in MR. RICHARDS' possession was pointed down toward the ground at the time HUTCHINS fired his assault rifle at MR. RICHARDS.

135.    CHIEF BUCKNER reviewed the entire criminal investigation file (Detective Division Case #16-120340), including the statements of HUTCHINS, Tyer, Mr. Underwood, Mr. James, Ms. Hunt, Mr. Stotts and Mr. Jenkins, among other witness statements.

136.    GO 303 authorizes the use of deadly force as follows: "Officers may only use Deadly Force to protect themselves or others from what they reasonably believe to be an threat of imminent death or serious physical injury."

137.    Because Mr. Underwood was in his house when HUTCHINS shot MR. RICHARDS, MR. RICHARDS did not pose an objectively reasonable threat of imminent death or serious physical injury to Mr. Underwood at that time.

138.    MR. RICHARDS did not pose an objectively reasonable threat of imminent death or serious physical injury to HUTCHINS or Tyer when HUTCHINS shot MR. RICHARDS.

139.    Because MR. RICHARDS did not pose an objectively reasonable threat of imminent death or serious physical injury to Mr. Underwood, HUTCHINS or Tyer at the time HUTCHINS shot him, HUTCHINS violated GO 303 when he shot and killed MR. RICHARDS on October 25, 2016.

140.    HUTCHINS was not disciplined for any violation of GO 303 in regard to MR. RICHARDS' shooting.

141.    HUTCHINS was not disciplined for any violation of LRPD policy in regard to MR. RICHARDS' shooting.

142.    Tyer was not disciplined for any violation of LRPD policy in regard to MR. RICHARDS' shooting.

26

143.    It is well-established in case law defining the contours of the Fourth Amendment to the United States Constitution that, whenever practicable, a warning must be given by a peace officer to an individual before deadly force is used against the individual.  The absence of a warning is a factor that influences Fourth Amendment analysis.  A simple statement by an officer that he fears for his safety or the safety of others is not enough to justify the use of deadly force; there must be objective factors present to justify the use deadly force.

144.    HUTCHINS did not warn MR. RICHARDS that he would use deadly force on MR. RICHARDS, or order MR. RICHARDS to drop his weapon.

145.    HUTCHINS violated GO 303 by not giving MR. RICHARDS a warning before using deadly force against him.

146.    HUTCHINS violated police protocol by not giving MR. RICHARDS a warning before using deadly force against him.

147.    On October 25, 2016, when HUTCHINS shot MR. RICHARD, HUTCHINS' assault rifle was his secondary weapon.

148.    GO 204 requires that LRPD officers always have their weapons fully loaded while on duty.

149.    HUTCHINS told investigators that his assault rifle was not fully loaded at the time he used it to shoot and kill MR. RICHARDS.

150.    GO 204 provides guidelines for usage of secondary firearms and specialized weapons.

151.    HUTCHINS violated GO 204 when he used his assault rifle to shoot and kill MR. RICHARDS in each of the following ways:

        a)     he did not have approval to use his assault rifle before he used it;

b)      the situation presented was not one for which use of a specialized weapon was expressly designated; and

c)      his assault rifle was not fully loaded while he was on duty.

152.    HUTCHINS was not disciplined for violating any aspect of GO 204 in regard to MR. RICHARDS' shooting.

153.    HUTCHINS was untruthful when he told investigators that MR. RICHARDS was traveling northward when HUTCHINS fired his weapon.

154.    HUTCHINS was untruthful when he told investigators that Mr. Underwood was outside when he fired his weapon at MR. RICHARDS.

155.    HUTCHINS was untruthful when he told investigators that MR. RICHARDS was pointing a gun at Mr. Underwood's back at the time HUTCHINS fired his weapon.

156.    Despite the fact that HUTCHINS was untruthful during his statement to LRPD investigators, he was not disciplined for violating Rule 1/8003.00.

157.    At all relevant times, LRPD rookies are trained to yell "gun" when they observe a suspect produce a gun in the field.

158.    Neither HUTCHINS nor Tyer yelled "gun" when they observed a gun in MR. RICHARDS' possession.

159.    HUTCHINS and Tyer violated police protocol and LRPD training by not yelling "gun" when they saw a gun in MR. RICHARDS' possession.

160.    Neither HUTCHINS nor Tyer were disciplined for not yelling "gun" when they observed a gun in MR. RICHARDS' possession.

161.     There are factual inaccuracies contained in the Crime Scene Entry/Exit Log pertaining to the criminal investigation of MR. RICHARDS' shooting (Detective Division Case #16-120340).

**COUNT I**
**DENNIS HUTCHINS**
**EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT**

162.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and sixty-one (161) as and for Paragraph one-hundred and sixty-two (162) of Count I.

163.     HUTCHINS used excessive force against MR. RICHARDS' person, causing great injury, pain and death.

164.     The force used by HUTCHINS was unnecessary and unreasonable, and MR. RICHARDS' great injury, pain and death resulted directly from the use of said force which was excessive.

165.     By reason of the conduct of HUTCHINS, MR. RICHARDS and his heirs-at-law were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

166.     The violence committed by HUTCHINS, and inflicted upon MR. RICHARDS was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of his Fourth Amendment Rights.   Therefore, HUTCHINS is liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain and suffering and punitive damages.

## COUNT II
## CHIEF KENTON BUCKNER AND THE CITY OF LITTLE ROCK
### *MONELL* VIOLATIONS

167.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and sixty-six (166) above as and for Paragraph one-hundred and sixty-seven (167) of Count II.

168.    A plaintiff may establish municipal liability under § 1983 by showing his constitutional rights wree violation by misconduct so pervasive among employees of the municipality "as to constitute a 'custom or usage' with the force of law."  *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998)(*quoting Monell*, 436 U.S. at 691).  Evidence that a police investigative review process is "structured to curtail disciplinary action and stifle investigations" is evidence that can sustain *Monell* claims and get those claims rightfully before a jury.  *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3rd Cir. 1996).

169.    In *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995), the Eighth Circuit Court of Appeals held that a law enforcement agency's "…inaction or laxness can constitute government custom if it is permanent and well settled" for purposes of determining whether final policymakers are deliberately indifferent to constitutional violations discovered during investigations of police misconduct.

170.    The practical effect of LRPD "in-house" criminal investigations of LRPD officers who have used deadly force on Little Rock citizens, is that the investigators are biased, intentionally lax and incentivized to "go easy" on their fellow officers who are, at that time, criminal suspects.

171.    Some of the ways LRPD investigators "go easy" on their fellow officers who are suspects in a criminal investigation of a police-involved shooting include:

- Avoiding questions which challenge the offending officer's account;

- Ignoring or minimizing facts that contradict the offending officer's account;

- Ignoring or minimizing witness accounts that contradict the offending officer's account;

- Ignoring or minimizing physical evidence that contradicts the offending officer's account;

- Assisting the offending officer by using leading questions with him;

- Frustrating non-police officer witnesses who contradict the offending officer's account by using leading questions with them;

- Interrupting non-police officer witnesses' attempts to state facts which are not favorable to the offending officers; and

- Intentionally failing to explore aspects of statements given by non-police officer witness which could lead to evidence that incriminates the offending officer.

172.    In December 2016, Sgt. Robert Mourot, an investigator with the IAD, testified regarding his opinion that in-house criminal investigations of police-involved shootings are not as fair to the shooting victim's family as are independent investigations by an equally competent law enforcement agency.

173.    In December 2016, Mourot was asked the following questions and gave the following answers under oath:

Q:    Let me ask you this question. **God forbid you had a loved one who was shot and killed by a police officer.** You're grieving.   You're upset.   Obviously, you want answers, right?

> A:     Correct.
>
> Q:     If you had a choice–as a family member of that loved one, that deceased loved one, **if you had a choice between the matter being investigated criminally by the department that employs the officer, or an equally qualified law enforcement agency,** equally resourced, that doesn't have that same connection with the offending officer, **if it were your loved one, which would you choose?**
>
> A:     **I'd probably choose the outside agency.**
>
> Q:     **Why would you do that?**
>
> A:     **To be fair.**
>
> Q:     **I mean, you would be more confident in the impartial handling of it than in the former example, right?**
>
> A:     **Yes.**  (emphasis added)

174.    In discovery in the matter of *Perkins v. City of Little Rock, et al.*, 4:15-CV-310, the plaintiff requested that the CITY identify all police-involved shootings committed by LRPD officers from "2000 to the present."

175.    In response to the *Perkins* plaintiff's discovery request, the CITY provided the document attached hereto as *Exhibit E*.  Based on *Exhibit E*, one-hundred and eighty-five (185) individuals were shot by members of the LRPD between 2000 and July 22, 2016.

176.    Of all the officers who fired their weapons in the police-involved shootings reflected in *Exhibit E*, only one (1) had a violation of GO 303 sustained against him.

177.    *Exhibit E*, which was produced by the CITY in discovery in federal civil rights litigation is incomplete and inaccurate, insofar as it omits mention of Irma Rogers, who was shot and killed by and LRPD officer in 2009.

178.     The CITY has previously produced inaccurate information in a federal civil rights lawsuit regarding a police-involved shooting by an LRPD officer.

### Inaccurate And Incomplete Files Created During LRPD "In-House" Criminal Investigations Of Police-Involved Shootings

179.     The CITY, by and through its chief of police and others, was notified multiple times in between 2005 and 2016 of institutional investigation deficiencies insofar as, on multiple occasions, the DFRB complained that it received incomplete or inaccurate files in its review of LRPD police-involved shootings and the LRPD investigations of those shootings.

180.     In 2012, in DFRB Case #12-17, the DFRB stated that their "recommendations call for more precision in the investigation of an officer involved shooting."

181.     In 2013, the DFRB noted that file inaccuracy was a "recurring theme at all Major Crime scenes and there should be more attention paid to these items as it may cause severe problems in the future."

### Inaccurate and Incomplete Crime Scene Logs In LRPD Police-Involved Shootings

182.     The CITY, through its chief of police and others, was notified of failures to maintain accurate crime scene logs during LRPD police-involved shooting investigations multiple times between 2005 and 2016.

183.     According to Det. Kevin Simpson, who has investigated over five-hundred (500) homicides during his career, inaccuracies or incompleteness on a crime scene log can call into question the integrity of evidence.  In September 2016, Simpson acknowledged under oath that inaccurate or incomplete crime scene logs have been an issue at the LRPD for "quite some time."

184.     According to Sgt. James Stephens, who is an IAD investigator, when information is lacking from crime scene logs, it constitutes a violation of LRPD policy.  In March 2016,

Stephens acknowledged under oath that incomplete crime scene logs can potentially compromise the integrity of the underlying criminal investigation.

**Failure to Properly Handle Weapons and Evidence in
LRPD Police-Involved Shooting Investigations**

185.    The CITY, through its chief of police and others, was notified of failures to properly handle weapons or other evidence during police-involved shooting investigations multiple times between 2005 and 2016.

186.    In 2011, the DFRB stated that it:

> "...**felt the [LRPD] Detective Division Investigation failed to include documentation from the patrol officers utilized to secure the apartment throughout the night while investigators were waiting until an authorized time to serve the search warrant.** The file indicates that officers assigned to the Northwest Patrol Division were utilized, but **the file fails to identify the officers and the times they were assigned to maintain security. The Board felt this documentation is critical to maintain the chain-of-evidence and reflect exactly who was present."** (emphasis added)

187.    In March 2016, former CSSU Technician, Stan Wilhite, gave a deposition in a federal civil rights lawsuit alleging excessive force against LRPD officers.  Under oath, Mr. Wilhite testified that in his twenty-three (23) years as a crime scene technician, LRPD officers complied with the crime scene protocol of informing his unit when weapons were moved before the arrival of crime scene technicians five (5) times, holding up his hand and gesturing "five" with an open hand, as reflected by *Exhibit F*, which is attached hereto.

188.    In August 2017, retired Pulaski County Coroner, Garland Camper, submitted an affidavit in a federal litigation wherein he attested as to his observations of "the LRPD's improper and habitual crime scene practices, particularly related to police-involved shooting

cases it investigated."   Among the deviations from proper crime scene procedure described by

Mr. Camper was:

    a)   unacceptably slow reaction time in contacting the coroner's
         office after learning of a death;

    b)   mishandling involved officers' weapons during
         investigations;

    c)   failing to properly maintain and complete crime scene logs;
         and

    d)   failing to initiate and maintain chains of custody for
         evidence.

### Historical Usage Of Improper Leading Questions By LRPD Investigators During "In-House" Investigations Of Police-Involved Shootings

189.    The CITY, through its chief of police and others, was notified of failures by

LRPD investigators to refrain from using leading questions during investigations of police-

involved shootings multiple times between 2005 and 2016.

190.    In June 2007, in DFRB Case #07-3864, which was a police-involved shooting, the

DFRB found that LRPD investigators used improper leading questions with the involved

officers.

191.    In 2012, in DFRB Case #12-17 which relates to an LRPD police-involved

shooting investigation, the DFRB found leading questions were asked on important issues by

investigating officers.  The DFRB stated that leading questions have "been an ongoing problem

and one that has been noted in previous investigative reviews but continues to exist with no

corrective actions taken."

192.    During deposition in 2016, Stephens acknowledged that he had been cautioned

many times about the use of leading questions during investigations of police-involved

shootings.  Stephens acknowledged that the use of leading questions by LRPD investigators was a recurring problem identified by prior DFRBs.

## Historical Undisciplined Policy Violations During Police-Involved Shootings

193.    The CITY, by and through its chief of police and others, was notified multiple times between 2005 and 2016 of problems with policy violations committed by LRPD officers going undisciplined.

194.    According to Thomas, all officers are required to report any violation of policy of which they are aware.  In July 2013, Thomas testified that he has previously failed to discipline a violation of policy in a police-involved shooting investigation during his tenure as chief because "[f]rankly I just didn't catch it during the review process."

195.    In December 2016, Mourot was asked under oath if he would characterize the Thomas' tenure in terms of his discipline style as either authoritarian or passive, and Mourot agreed that he would characterize Thomas as "a passive, laid-back kind of chief."

196.    According to Mourot, one of the roles of the IAD is to "spot-check" police-involved shooting files for violations of policy, and to recommend a review of potential policy violations.  According to Mourot, if the IAD was to identify a policy violation committed during a police-involved shooting, it is the responsibility of that office to report it.

197.    In 2011, the DFRB stated:

> "In reference to the Internal Affairs portion of the investigation, the Board had concerns regarding the uniforms worn by Officers Lesher and McCrillis.  **The uniform issue was addressed by Internal Affairs during interviews, but at the conclusion of their investigation, it was not listed as a possible violation to be considered during final review**…the clothing worn was not Departmentally issued or approved.  **The Board felt this should have been a violation noted at the conclusion of the Internal Affairs investigation."**  (emphasis added)

36

198.     In December 2016, Mourot testified that the two (2) officers involved in that same 2010 shooting of Eugene Ellison violated GO 203 (*Uniform Regulations*) in multiple ways but, despite these violations, the officers were not disciplined.   Mourot testified that the officers should have been disciplined for violations of GO 203.

199.     In September 2016, the commander of the Training Division, Capt. Heath Helton, testified that the LRPD officer who shot Mr. Ellison in December 2010 did not follow GO 303 when, from outside Mr. Ellison's home, she shot Mr. Ellison, who was inside his home.   The LRPD officer who shot and killed Mr. Ellison was not disciplined for the violation of GO 303.

200.     In September 2012, even though it was determined by LRPD investigators that the LRPD officer who shot and killed 15-year-old Bobby Moore was untruthful during the in-house criminal investigation of the shooting, Thomas ultimately did not sustain a violation of Rule 1/8003.00 against him, despite acknowledging in an official public statement that the officer was untruthful to LRPD investigators.

201.     In April 2006, Capt. Tom Bartsch acknowledged the notion that patternistic bad behavior can exist even though prior complaints demonstrating bad behavior have not been sustained.

202.     In   April   2006,   in   IAD   Case   #06-3670,   Bartsch   provided   his Comments/Recommendations regarding the subject officer as follows:

> "I concur [with the recommended discipline].  **Officer []'s past rude and unprofessional complaints have described very similar behavior as is noted in this complaint.  Although they were not sustained, it does appear that a pattern of this behavior may exist.**  It shows a lack of judgement and common sense.  I agree that he should be given a written reprimand and that his off-duty should be suspended until successful completion of an evaluation by EAP to determine if there are more serious underlying problems."  (emphasis added)

203.    In April 2006, in IAD Case #06-3670, Bartsch recommended discipline for the subject officer, but the subject officer was not disciplined by Thomas despite the recommendation.

204.    When questioned about the importance of following LRPD policy, Helton testified as follows:

> Q:    Don't you believe that when rules are not properly enforced, those who are to follow the rules don't follow them as closely as they would otherwise?
>
> *****
>
> A:    **No.  I think people tend to make choices on their own, people decide to do things on their own.**  Whether they feel like – you know, whether it's – they feel like they can get out here because their supervisor is not – you know, whether I'm tied up in the office all day long, **I'm not out here to keep – you know, keep a good eye- watchful eye on my troops,** you know, and they'll – and **they'll tend to go out here and make poor decisions.**  I think that's an internal decision; people tend to make those. I mean –
>
> Q:    Right.
>
> A:    - **a person decides to go out here and do something wrong, then that's something they solely did on their own.**
>
> Q:    Right.  But isn't that why you have policies?
>
> A:    Yeah.  **But you – you –**
>
> Q:    Yeah.
>
> A:    **- knew as well as I know some people don't adhere to policies.**
>
> Q:    Yeah.  **But it's up to you to enforce the policies, isn't it?**
>
> A:    **Yeah, I agree.**

38

> Q:    You're not just supposed to throw your hands in the air and
>        say they won't listen; right?
>
> A:    No.  (emphasis added)

### Historical Failures To Collect, Preserve And Test Evidence During "In-House" LRPD Police-Involved Shooting Investigations

205.    The CITY, by and through its chief of police and others, was notified of failures by LRPD investigators and/or the CSSU to properly collect, preserve or test evidence in LRPD police-involved shootings multiple times between 2009 and 2016.

206.    In 2012, in DFRB Case #12-17, the DFRB reported that LRPD investigators failed to collect fingerprint or DNA samples for analysis that would connect the deceased suspect with the weapon he allegedly possessed when he was shot by police.  The DFRB reported that the evidence should have been collected and, despite the failure to collect it, the IAD, which reviewed the in-house criminal investigation for any possible investigatory and supervision failures, falsely reported that  LRPD investigators "marked, photographed and collected all evidence."

207.    In 2016, Helton acknowledged that blood identified on a gear shifter should have been tested and fingerprints of the gear should have been taken, but neither was done by the LRPD investigators who performed the in-house criminal investigation of the Bobby Moore shooting.

### Historical Failure To Interview Witnesses in "In-House" LRPD Police-Involved Shooting Investigations

208.    The CITY, through its chief of police and others, was notified of failures to interview witnesses multiple times between 2010 and 2016.

209.    In June 2007, in DFRB Case #07-3864, which relates to an LRPD police-involved shooting investigation, the DFRB found that LRPD investigators failed to conduct a follow-up interview regarding the police-involved shooting victim with one of the witnesses.

210.    In August 2012, an eyewitness to aspects of the police-involved shooting in the *Perkins* matter told an LRPD investigator that she was awakened by a loud banging noise, and went to her first-floor bedroom window, where saw a police officer near a car containing the victim of a police-involved shooting.  Despite this, the LRPD investigator did not follow upon this information, or ask her to describe what she observed.

211.    In 2016, that LRPD investigator confirmed under oath that the woman was an "eyewitness" in the criminal investigation.  He was asked questions about his decision not to take a recorded statement from this eyewitness, and he gave the following answers under oath:

> Q:    **And did you ask [the eyewitness] what that police officer looked like?**
>
> A:    **No.  She said it was a police officer, so I assumed that it's going to be a uniformed officer.**
>
> Q:    Well, did –
>
> A:    That's why – how else would she have known it was a police officer?
>
> Q:    Well, right.  But how – there are several potentially several uniformed officers in the area; correct?
>
> A:    We all have the same uniform.
>
> Q:    **My question is is did you ask [the eyewitness] to describe in any greater detail the officer that she saw at the car?**
>
> A:    **No I did not.**
>
> Q:    Did you ask her if the officer was white or black?

A:      No, I did not.

Q:      Tall or short?

A:      Did not.

Q:      Heavy or thin?

A:      No, I did not.

Q:      Why not?

A:      There was no reason to.  What – she didn't see the incident.

Q:      Isn't it possible – strike that.  Do you understand that there is a controversy here about what the car driven by [the victim] was doing at the time that [the officer] shot it?

A:      That's – yes.

Q:      Okay.  And the controversy or the uncertainty, if you will, is whether the car was in drive, reverse, or something else. Is that your understanding generally of some of the questions about the incident?

A:      Correct.

Q:      **And so if [the eyewitness] saw an officer at the car, do you agree with me that what she might have seen the officer doing at the time after the shooting could be pertinent to the criminal investigation?**

A:      **If she saw the officer doing anything.  If he was just standing there and –**

Q:      **You didn't – you didn't ask her what the officer was doing, though?**

A:      **No.  She said she saw an officer, saw the officer at the car.**

Q:      **Right.  You didn't ask her what the officer was doing?**

A:      **No, I did not.**

Q:      **Why not?**

A:      **Didn't seem pertinent.**

Q:      If the officer was manipulating the gear shifter, would that be pertinent?

A:      Well, she would have said that – saw him inside the car.

Q:      **I'm asking you a question.  If she saw the officer manipulating the gear shifter after the shooting, would that be pertinent to the investigation?**

A:      **Yes.**

Q:      **You never asked her if she saw that; correct?**

A:      **No.**

*****

Q:      Did you ask [the eyewitness] what the demeanor of that officer was at the time that she saw him?

A:      I did not.

Q:      Did you ask her if he was looking around in a suspicious manner?

A:      No, I did not.

Q:      Did  you ask her if he entered the car?

A:      No, I did not.

Q:      Did you ask her if he wiped the car down in any fashion?

A:      No, I did not.

Q:      Aren't these all squarely pertinent questions in a criminal investigation?

A:      If she would have made mention that she saw something other than the officer standing there, then I would have got that information.

Q:     Well, she didn't say she saw an officer standing there, she said –

A:     Well, she said –

Q:     - at the car.

A:     - she saw an officer.  Rather than seeing an officer, if she'd have said any of those things that you just mentioned, yes, that would have made it pertinent to me.

**Q:     Isn't it the job of an investigator, though, to ask the questions to get that information?**

**A:     Yes.**

**Q:     You didn't ask those questions?**

**A:     No, I did not.**

*****

Q:     So is there a reason why you didn't want to ask any further questions to see if you could identify which officer she was talking about?

A:     If I thought that the description of the officer made a difference, then I would have, yes.

*****

Q:     [If the eyewitness testified that the officer she saw was panicky], if that were true, would that be pertinent to your criminal investigation?

A:     If she told me that, yes.

Q:     If it – if it was true, would that be pertinent?

A:     I would assume that all – most of the officers there would be nervous.  But, yes, I see what you're saying.  But, no, I mean – yes.  to answer your question is yes.

*****

> Q:     Were you ever to – able to learn where her window was in proximity to the car at rest?
>
> A:     I don't recall.
>
> Q:     Did you ever ask her to point out the window that she looked out of?
>
> A:     No, I did not.  (emphasis added)

212.    Years after her encounter with the LRPD investigator, this eyewitness testified that she looked out her bedroom window after hearing gunshots, and saw an officer by her window.  She testified that the officer saw her looking at him, and yelled through the glass, "get down, get down!"  This occurred just a  few moments after the gunshots.  She described the officer as being "in panic mode."

213.    In 2016, DFRB member Helton he testified that it was a failure of LRPD investigators to not take a formal, recorded statement of the eyewitness.  Helton was asked the following questions, and gave the following answers under oath:

> Q:     **Okay.  So my question is is should a statement have been taken of that woman?**
>
> A:     **Yes.**
>
> MS. LAFEVER: Objection.
>
> BY MR. LAUX:
>
> Q:     Okay.  I'm going to represent to you that it was not.  If it's as described and if her statement was never taken, do you consider that to be a flaw in the detective division investigation?
>
> MS. LAFEVER: Objection.
>
> A:     I don't know if you call it a flaw – a flaw, an oversight on our part, you know, I don't know.
>
> BY MR. LAUX:

> Q:   **Well, it's either a flaw or an oversight; right?**
>
> A:   **Fair enough.**
>
> Q:   Because the witness might have nothing to report, but she might; right?
>
> A:   Yes, sir.
>
> Q:   And the way you do that is by taking her statement; correct?
>
> A:   Yes, sir.
>
> Q:   **So the failure to take her statement however it turns out, is an investigation failure of the detective division; do you agree with that or not?**
>
> A:   **Yes, sir.**   (emphasis added)

214.    In August 2016, another eyewitness to aspects of the *Perkins* incident told another LRPD investigator that she heard car doors slamming and a loud bang around the time of the shooting.  She told that investigator that she looked out her bedroom window, and saw two (2) police officers looking into a gray car.  The LRPD investigator identified her as an eyewitness at that time, but he did not take a formal statement of her or follow up on the observations she disclosed to him.  In 2016, that LRPD investigator was asked the following questions and gave the following answers under oath:

> Q:   Did you question the occupants of the building immediately in front of the parking structure you just described?
>
> A:   It was one of those buildings, yes.
>
> Q:   Okay.
>
> A:   And I believe I spoke with five people.  The rest of them, there were no answer.  One of those individuals would not tell me anything other than his name.  The other individuals, nobody actually saw it.  They heard gunshots.

And one person heard yelling and gunshots, and a loud bang, I believe.

Q:     Okay.

A:     But nobody actually saw anything –

Q:     Okay.

A:     - that I recall.  See Ex. 12 at 80:9-81:5.

*****

Q:     I'd like to redirect you to Exhibit Number 4.  And that's a report that has to do – that you drafted, that has to do with the canvassing of the neighborhood that you did, right?

A:     Yes.

Q:     Now, if you'd turn to the pages that actually have the grid on them.

A:     Yes.

Q:     These are the individuals that were contacted or that or with whom contact was attempted, correct?

Q:     Yes.  By me, yes.

Q:     Okay.  And so I think it's the second page of this, number 8, there's a person whose address is 13111 West Markham, Number 265, correct?

A:     Correct.

Q:     And her name is [the eyewitness], right?

A:     Yes.

Q:     And according to this document, [the eyewitness] stated that she heard a lot of what sounded like car doors slamming and then a loud bang.  She stated that she did not hear any gunshots, but when she looked out she saw two police officers looking into a gray car.

A:     Yes.

Q:      Did I read that accurately?

A:      Yes.

Q:      **She's an eyewitness, isn't she?**

A:      **Yes.**

Q:      **Did you take her statement?**

A:      **Other than this, no.**

Q:      **Did you take a detailed, Detective, tape-recorded statement of [the eyewitness]?**

A:      **No, I did not.**

Q:      **You acknowledge that she told you that she saw two police officers looking into a gray car, correct?**

A:      **Yes.**

Q:      **Don't you think that's that kind of information that should have been followed up on?**

MS. LAFEVER: Objection.

A:      **Yes.**

BY MR. LAUX:

Q:      **Is there a reason why a detailed statement wasn't taken from her?**

A:      **No.**

                              *****

Q:      Okay.  Who are the two officers that she saw looking into the gray car?

A:      I don't know.

Q:      What did they look like?

A:      I don't know.

Q:      What were they doing near the car?

A:      I don't know.

Q:      Were they having a conversation?

A:      I don't know.

Q:      Is it a fair statement, Detective, to say that you failed to follow up with [the eyewitness] to see if she had information that might be helpful to the criminal investigation?

A:      I should have found out who the officers were, yes.

Q:      Did anyone that you work with – strike that.  I mean, you should have gotten as much information from her as possible, correct?

A:      Yes.

Q:      Did anybody that you work with at the detective division look over this document and say to you, "Hey, we've got to talk to [the eyewitness].  She might have some information for us"?

A:      No.

Q:      Did anybody make the suggestion that you contact her again?

A:      No.

*****

Q:      Would you agree that the failure to rule in or out [the eyewitness] as a useful eyewitness in this matter represents a flaw in the criminal investigation?

MS. LAFEVER: Objection.

A:      I would agree that I should have followed up on it.

*****

48

BY MR. LAUX:

Q:      You didn't ask any follow-up questions?  You didn't ask her to elaborate on what she saw, did you?

A:      No.  No.

Q:      You don't know if the two officers were a man and a woman, two men, or two women, do you?

A:      I do not.

Q:      You don't know if they 're white, black, or Latino, right?

A:      I do not.

Q:      All right.  If you could do this all over again, would have asked – would you have taken a detailed statement of her?

MS. LAFEVER: Objection.

A:      Looking back on it now, yes, I would have.

*****

Q:      The strength of the information that [the eyewitness] could potentially provide to your investigation was never fully fleshed out, true?

A:      It was not followed up on, no, if that's what you're asking. (emphasis added)

215.    In November 2011, in DFRB Case #11-4485, regarding another police-involved shooting, the DFRB noted the failure of the IAD to do a follow-up interview an "independent witness to [the] incident."

216.    In December 2011, in DFRB Case #10-4414, regarding another police-involved shooting "in-house" criminal investigation performed by LRPD investigators, the DFRB noted the failure of LRPD investigators to identify an important witness, and to interview him.

**Historical Failure Of The IAD To Sustain Failures To Supervise And Investigate During LRPD "In-House" Criminal Investigations Of Police-Involved Shootings**

217.    According to Mourot, the IAD is responsible for evaluating a citizen's failure to investigate claim against an LRPD officer, and also responsible for determining whether there was a failure to investigate during in-house investigations of LRPD police-involved shootings.

218.    According to Mourot, examples of failing to investigate include:

- Failing to question an eyewitness;

- Failing to follow up with leads of witnesses;

- Failing to collect evidence;

- Failing to collect evidence in a timely manner;

- Failing to preserve evidence

219.    Since 2000, the IAD has never recommended sustaining a violation of failure to investigate stemming from any LRPD in-house investigation of a police-involved shooting committed by an LRPD officer.

220.    Since 2000, the IAD has never recommended sustaining a violation of failure to supervise stemming from any LRPD in-house investigation of a police-involved shooting committed by an LRPD officer.

221.    In the LRPD criminal investigation of the police-involved shooting of MR. RICHARDS, the crime scene log is inaccurate, LRPD investigators used leading questions, LRPD investigators avoided facts that refuted HUTCHINS' account of the shooting and there were issues collecting evidence.

## DEFENDANT DENNIS HUTCHINS' Discipline History

222.    In his career as an officer with the LRPD, HUTCHINS was accused of engaging in excessive force on at least four (4) occasions prior to October 25, 2016.  Prior to October 25, 2016, the LRPD had never sustained an allegation of excessive force against HUTCHINS.

223.    Prior to October 25, 2016, the LRPD sustained at least three (3) violations of GO 316 (*Mobile Video Recorder*), with at least two (2) of them for failing to active his camera when he should have activated his camera.

224.    Prior to October 25, 2016, HUTCHINS has been accused of planting evidence, which the LRPD did not sustain.

225.    Prior to October 25, 2016, the LRPD had sustained the following allegations against HUTCHINS:

    a)  Mishandling prisoner property (missing wallet);

    b)  Profanity;

    c)  Taunting/belittling;

    d)  Neglect of duty; and

    e)  Inadequate investigation.

226.    On and prior to October 25, 2016, and at all relevant times, there existed at the LRPD a *Monell* custom which consists of the institutional toleration of excessive force, as well as institutional and intentional laxness and inaction in the form of meaningless "in-house" criminal investigations of police-involved shootings and meaningless IAD investigations of police misconduct.

227.    CHIEF BUCKNER and/or the CITY allowed this custom by:

    a)  tolerating violations of policy by LRPD officers, including HUTCHINS;

b) tolerating acts of excessive force by LRPD officers, including HUTCHINS;

c) disregarding and ignoring allegations or facts of excessive force committed by LRPD officers, including HUTCHINS;

d) affirmatively covering up or concealing allegations or facts of excessive force committed by LRPD officers, including HUTCHINS;

e) authorizing in-house criminal investigations of LRPD police-involved shootings, despite notice of problems with investigation procedures;

f) authorizing in-house criminal investigations of LRPD police-involved shootings, despite notice of biased investigation procedures; and

e) failing to adequately discipline policy violations identified during police-involved shooting investigations, including HUTCHINS' October 25, 2016 shooting of MR. RICHARDS.

228.    This pattern of police misconduct and violations of police general orders was so pervasive as to constitute a "custom or usage" with the force of law.

229.    The customs described above were the moving force behind the violations of MR. RICHARDS' constitutional rights committed by HUTCHINS, and proximately caused MR. RICHARDS' personal injuries, great pain and death.   The custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to  MR. RICHARDS and his heirs-at-law by the Fourth and Fourteenth Amendments to the United States Constitution, including due process, and laws enacted thereunder.

230.    As a result of the customs described above, MR. RICHARDS was subjected to excessive force and caused to die.  Therefore, CHIEF BUCKNER and/or the CITY is liable to

PLAINTIFF in damages under 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain and suffering and punitive damages.

<u>COUNT III</u><br>
DENNIS HUTCHINS<br>
<strong>WRONGFUL DEATH PURSUANT TO ARKANSAS CODE § 16-62-102(a) and (b)</strong>

231.     PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through two-hundred and thirty (230) above as and for Paragraph two-hundred and thirty-one (231) of Count III.

232.     On August 12, 2012, HUTCHINS owed MR. RICHARDS a duty to maintain public order and to enforce at all times all such laws, ordinances and regulations for the preservation of good order and the public welfare, including the duty to follow all such laws, ordinances and regulations.

233.     Disregarding those duties, HUTCHINS was guilty of one more of the following acts which proximately caused MR. RICHARDS' death:

a)     shot and killed MR. RICHARDS without legal justification.

234.     By reason of the wrongful death of MR. RICHARDS, MR. RICHARDS and his heirs-at-law have incurred pecuniary damages and severe mental anguish.

235.     PLAINTIFF brings Count III pursuant to Ark. Code. Ann. § 16-62-102(a) and (b) which provides for damages whenever the death of a person shall be caused by a wrongful act notwithstanding the death of the person.

WHEREFORE, PLAINTIFF prays for judgment against J. HASTINGS, in an amount which will fully and fairly compensate PLAINTIFF for damages suffered.

## COUNT IV
## DENNIS HUTCHINS
## SURVIVAL PURSUANT TO ARKANSAS CODE § 16-62-101(a)(1)

236.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through two-hundred and thirty-five (235) above as and for Paragraph two-hundred and thirty-six of Count IV.

237.    On October 25, 2016, prior to his death, MR. RICHARDS suffered personal injuries and great pain proximately caused by the wrongful acts and/or omissions of HUTCHINS, which included shooting MR. RICHARDS multiples times.

238.    By reason of the wrongful acts and/or omissions of J. HUTCHINS, MR. RICHARDS incurred personal injuries and great pain as well as damages in the form of loss of life.

239.    PLAINTIFF brings Count IV pursuant to Ark. Code. Ann. § 16-62-101(a)(1) which provides for damages for wrongs done to a person and further provides that such an action may be brought after the death of the person by his executor.

WHEREFORE, PLAINTIFF prays for judgment against HUTCHINS, in an amount which will fully and fairly compensate PLAINTIFF for damages suffered by MR. RICHARDS.

WHEREFORE, Plaintiff, VANESSA COLE, Personal Representative of the Estate of ROY LEE RICHARDS, JR., deceased, by and through her attorneys, DODDS, KIDD & RYAN and LAUX LAW GROUP, and requests judgment against the Defendants and each of them:

1. That Defendants be required to pay PLAINTIFF's compensatory damages;

2. That Defendants be required to pay actual damages;

3. That Defendants be required to pay attorney fees per 42 U.S.C. § 1988; and

4.  That PLAINTIFF have any other such relief as this Honorable
    Court deems just and proper.

Respectfully submitted,


/s/ Michael J. Laux_____
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue
Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com


and

Judson C. Kidd
Arkansas Bar No. 75071
One of the Attorneys for PLAINTIFF
DODDS, KIDD, RYAN &  ROWAN
313 W. 2nd Street
Little Rock, 72201
Telephone: (501) 375-9901
Facsimile: (501) 376-0387
judkidd@dkrfirm.com

Lucas Z. Rowan
Arkansas Bar No. 2008191
One of the Attorneys for PLAINTIFF
DODDS, KIDD, RYAN & ROWAN
313 W. 2nd Street
Little Rock, AR 72201
Telephone: (501) 375-9901
Facsimile: (501) 376-0387
lrowan@dkrfirm.com

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2016-Nov-04  10:09:45
60PR-16-2171
C06D17 : 1 Page

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
ROY LEE RICHARDS, JR., DECEASED

CASE NO. _60PR-16-2171_

### ORDER APPOINTING SPECIAL ADMINISTRATOR

Upon the Petition for Appointment of Special Administrator filed by the petitioner

herein, Vanessa R. Cole, is hereby appointed Special Administrator of the Estate of Roy Lee

Richards, Jr.

IT IS SO ORDERED.

_____
Circuit Judge

Date: _11-4-16_

Prepared By:

/s/ Lucas Rowan
_____
Lucas Rowan (080191)
DODDS, KIDD & RYAN
Attorney for Petitioner
313 West Second Street
Little Rock, AR 72201
Telephone: (501) 375-9901
Facsimile: (501) 376-0387
Email: lrowan@dkrfirm.com

# EXHIBIT A

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2016-Nov-04  14:00:30
60PR-16-2171
C06D17 : 1 Page

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## PROBATE DIVISION

**IN THE MATTER OF THE ESTATE OF**
**ROY LEE RICHARDS, JR., DECEASED**      CASE NO. 60PR-16-2171

### ACCEPTANCE OF APPOINTMENT AS SPECIAL ADMINISTRATOR

The undersigned, Vanessa R. Cole, having been appointed special administrator of the

Estate of Roy Lee Richards, Jr., hereby accepts the appointment.

Dated this ___4th___ day of November, 2016.

_Vanessa Cole_
Vanessa R. Cole

### ACKNOWLEDGMENT

| | |
|---|---|
| **STATE OF ARKANSAS** | ) |
| | ) ss |
| **COUNTY OF PULASKI** | ) |

On this day, before the undersigned, a Notary Public, duly qualified and acting in and for the State and County aforesaid, personally appeared the affiants, satisfactorily proven to be the persons whose name appears in the foregoing instrument, and states that they had executed the same for the consideration, and purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of November, 2016.

_Ronda K. Johnson_
Notary Public

My Commission Expires:

_February 22, 2026_

PREPARED BY:
/s/ Lucas Rowan
Lucas Rowan (080191)
DODDS, KIDD & RYAN
Attorneys for the Petitioner
313 West Second Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9901
Facsimile: (501) 376-0387
Email: lrowan@dkrfirm.com

**EXHIBIT A**



**EXHIBIT B**



**EXHIBIT C**



RP2

RP3

E. 8th Street

S. Commerce Street

Approx. Scale- ft.
0
10
20

City of Little Rock
Police Department
Crime Scene Search Unit

Date 10/25/16
Incident Off. Involved Shooting
Incident # 2016-120340
Victim Roy Richards
Location 514 E. 8th St.

Unit 2331

INVESTIGATIVE
ONLY

221

**EXHIBIT C**



E1: Hornady .223 Rem spent casing
E2: Hornady .223 Rem spent casing
E3: Hornady .223 Rem spent casing
E4: Hornady .223 Rem spent casing
E5: Hornady .223 Rem spent casing
E6: Black baseball cap with camoflauge bill
E7: Black BB gun
E8: Black sunglasses
E9: Black tee-ball bat

V1: Chevrolet Blazer ARLPN: 096UWZ
V2: Maroon Monte Carlo ARLPN: 022UYG
V3: Dodge Journey ARLPN: 672UCN
V4: Volvo S80 ARLPN: 988WG2
V5: Hyundai Elantra ARLPN: 277ORA
V6: Toyota Highlander ARLPN: 949UDD
V7: Subaru Outback ARLPN: 500SLF

City of Little Rock
Police Department
Crime Scene Search Unit

Location: 514 E. 8th Street

Case Number #
Police Incident # Crime: Officer Involved Shooting 2016-1203.40
Date/Time: 12/26/16
Drawn by: Roy Richards

E. 8th Street

RP2

RP1

514

516

Approx. Scale-ft.
0    10    20

Scene A

Scene B

951"



INVESTIGATIVE
ORIGINAL

220

**EXHIBIT D**

LRPD USE OF DEADLY FORCE
2000-PRESENT

| Date of Incident | IA Number | Incident Number | OFC First Name | OFC Last Name | Race/Sex | SUS First Name | SUS Last Name | Race/Sex |
|---|---|---|---|---|---|---|---|---|
| 2/19/2000 | II2000-2572 | 2000-20171 | Elissa | Jackson | WF | Frank | Gomez | HM |
| 7/18/2000 | II2000-2649 | 2000-87165 | Allen | Quattlebaum | WM | Dale | Woofard | WM |
| 4/14/2001 | II2001-2750 | 2001-45466 | Greg | Smith | BM | Norman | Rollins | BM |
| 4/22/2001 | II2001-2754 | 2001-49153 | Leticia | Cross | WF | Brandon | Bose | WM |
|  |  |  | Angela | Boyer | WF |  |  |  |
| 10/9/2001 | II2001-2855 | 2001-125989 | Jerry | Hart | BM | Unknown |  | BM |
| 10/25/2001 | II2001-2863 | 2001-133614 | Robert | Dodson | WM | Unknown |  | BM |
| 12/19/2001 | II2001-2882 | 2001-156766 | Hayward | Finks | BM | Samuel | Watson | BM |
| 2/1/2002 | II2002-2895 | 2002-13060 | Johnny | Gravett | WM | William | Clack | WM |
|  |  |  | Jack | Cooper | WM |  |  |  |
| 3/7/2002 | II2002-2914 | 2002-27055 | Mike | Gray | WM | Michael | Braggs | BM |
|  |  | 2002-27055 | Joshua | Black | WM |  |  |  |
| 3/22/2002 | II2002-2923 | 2002-33631 | Van | Watson | BM | Barbara | Jones | BF |
| 4/11/2002 | II2002-2933 | 2002-41677 | Kenny | Baer | WM | Maurice | Ford | BM |
| 4/17/2002 | II2002-2937 | 2002-44737 | Marcus | Paxton | WM | Aaron | King | BM |
|  |  |  | Anthony | Moore | WM | Christopher | Cochran | BM |
| 5/1/2002 | II2002-2946 | 2002-51478 | Richard | Glascock | WM | Larry | Jackson | BM |
| 5/4/2002 | II2002-2948 | 2002-52560 | Marc | Collins | BM | Michael | Steinbeck | WM |
| 6/30/2002 | II2002-2988 | 2002-79931 | Dennis | Ball | WM | Terren | Brown | BM |
|  |  |  | Joshua | Scherrey | WM |  |  |  |
| 7/24/2002 | II2002-3004 | 2002-291261 | Alma | Lambert | WF | Reginald | Fudge | BM |
| 8/31/2002 | II2002-3039 | 2002-110049 | J.T. | Alexander | WM | Larry | Shaw | WM |
| 9/8/2002 | II2002-3045 | 2002-113624 | Charles | Johnson | BM | James | Gaddie | BM |
| 1/1/2003 | II2003-3106 | 2003-360 | Jeff | King | WM | Erin | Eckford | BM |
|  |  |  | Matthew | Smith | WM |  |  |  |
|  |  |  | Van | Watson | BM |  |  |  |
| 1/17/2003 | II2003-3117 | 2003-6594 | Joe | Hill | WM | Nathaniel | Osborne | WM |
| 3/2/2003 | II2003-3135 | 2003-24290 | Heath | Atkinson | WM | Jimmy | Kisling | WM |
| 3/19/2003 | II2003-3146 | 2003-32102 | Edward | Moring | WM | Pedro | Smith | WM |
| 12/18/2003 | II2003-3288 | 2003-158008 | Jarmall | Lovelace | BM | Unknown |  | BM |
| 12/31/2003 | II2003-3291 | 2003-162942 | Roger | Wallis | WM | Michael | Coleman | BM |
| 1/12/2004 | II2004-4976 | 2004-3295 | Greg | Smith | BM | Daniel | Jordan Sr. | BM |
| 1/31/2004 | II2004-3304 | 2004-12866 | Jana | Rayburn | WF | Dolandon | Mack | BM |

**EXHIBIT E**

## LRPD USE OF DEADLY FORCE 2000-PRESENT

| Date of Incident | IA Number | Incident Number | OFC First Name | OFC Last Name | Race/Sex | SUS First Name | SUS Last Name | Race/Sex |
|---|---|---|---|---|---|---|---|---|
| | | | Timothy | Dillon | WM | | | |
| 2/23/2004 | II2004-3317 | 2004-22130 | David | Green | BM | Marc | Harris | BM |
| | | | Tagos | Robinson | BM | | | |
| | | | Rick | Harmon | WM | | | |
| 4/17/2004 | II2004-3345 | 2004-45639 | Rick | Wilson | WM | Robert | Allen | BM |
| 11/26/2004 | II2004-3457 | 2004-142958 | Kristian | Davenport | WM | Antonio | Alexander | BM |
| 1/1/2005 | II2005-3480 | 2005-42 | Greg | Birkhead | WM | Gloria | Brown | BF |
| 1/4/2005 | II2005-3481 | 2005-1240 | John | Brawley | WM | Daniel | Baker | WM |
| | | | Timothy | Dillon | WM | | | |
| | | | Robert | Martin | WM | | | |
| | | | Ian | Ward | WM | | | |
| 5/8/2005 | II2005-3538 | 2005-51131 | Joshua | Black | WM | Cleveland | West Jr. | BM |
| 5/18/2005 | II2005-3543 | 2005-55607 | Aaron | Oncken | WM | Greg | Colwye | BM |
| 7/14/2005 | II2005-3567 | 2005-36085 | Bruce | Maxwell | WM | Alexander | Jones | BM |
| 7/15/2005 | II2005-3568 | 2005-82548 | Ian | Ward | WM | Timothy | Boyd | BM |
| | | | Robbie | Kelley | BF | | | |
| | | | John | Brawley | WM | | | |
| 9/14/2005 | II2005-3598 | 2005-109108 | Clark | Sheffield | WM | Ronald | Jacobs | BM |
| 1/9/2006 | II2006-3647 | 2006-3490 | Allen | Quattlebaum | WM | Lisa | Wiley | WF |
| 7/1/2006 | II2006-3749 | 2006-77942 | Charles | Allen | BM | Ervin | Owens | BM |
| | | | Eliot | Young | WM | | | |
| 8/22/2006 | II2006-3769 | 2006-101253 | Mark | Knowles | WM | Jackie | Grider | WM |
| 9/3/2006 | II2006-3773 | 2006-106083 | Stephanie | Berthia | BF | Jamie | Alvarez | HM |
| | | | | Blackman | BM | | | |
| | | | | Carr | BM | | | |
| | | | | Eubanks | BF | | | |
| | | | | Harper | BM | | | |
| | | | | Weihouse | WM | | | |
| | | | | Lovelace | BM | | | |
| | | | | Sanders | BM | | | |
| 12/6/2006 | II2006-3817 | 2006-145087 | Chris | Littleton | WM | Andre | Glenn | BM |
| | | | Ryan | Hudson | WM | | | |
| 12/27/2006 | II2006-3826 | 2006-152983 | Randy | Brown | WM | Andre | Pride | BM |

**EXHIBIT E**

LRPD USE OF DEADLY FORCE
2000-PRESENT

| Date of Incident | IA Number | Incident Number | OFFICER | | | SUSPECT | | |
|---|---|---|---|---|---|---|---|---|
| | | | OFC First Name | OFC Last Name | Race/Sex | SUS First Name | SUS Last Name | Race/Sex |
| 3/13/2007 | I2007-3864 | 2007-28608 | Spurgeon | Leavy | BM | Kendrick | Webb | BM |
| 4/26/2007 | I2007-3874 | 2007-47432 | Carrie | Mauldin | WF | David | Veasey | BM |
| 7/7/2007 | I2007-3907 | 2007-81081 | David | Green | BM | Terry | Mudge | WM |
| | | | Paige | Cline | WF | | | |
| 10/30/2007 | I2007-3953 | 2007-131918 | Joshua | Black | WM | Lance | Stucker | WM |
| 4/14/2008 | I2008-4015 | 2008-39473 | George | Wilson | BM | Brent | Mosley III | BM |
| | | | Timothy | Pope | WM | | | |
| 7/16/2008 | I2008-4046 | 2008-81343 | Steve | Woodall | WM | William | Spradling | WM |
| | | | Michael | Ford | BM | | | |
| | | | Clay | Hastings | WM | | | |
| 8/13/2008 | I2008-4058 | 2008-93435 | David | Green | BM | | | |
| 9/17/2008 | I2008-4071 | 2008-108190 | Kayward | Jolly | BM | Mario | Collins | BM |
| | | | David | Caplinger | WM | | | |
| 1/9/2009 | I2009-4122 | 2009-3267 | Matthew | White | WM | Leo | Darrough Jr. | BM |
| 1/23/2009 | I2009-4131 | 2009-8570 | Sheva | Howard | BF | Christopher | Cahill | WM |
| | | | Kaward | Jolly | BM | | | |
| | | | Ernest | Hilgeman | WM | | | |
| | | | Dustin | Derrick | WM | | | |
| | | | Christopher | Ringgold | WM | | | |
| 1/30/2009 | I2009-4134 | 2009-10564 | Jackie | Parker | BM | Denzel | Couch | BM |
| 4/1/2009 | I2009-4166 | 2009-36521 | Michael | Ford | BM | Justin | Watson | BM |
| 4/17/2009 | I2009-4179 | 2009-41480 | Brandon | Middleton | BM | Mathew | Cheatham | WM |
| | | | James | Stanchak | WM | | | |
| 11/3/2009 | I2009-4276 | 2009-126429 | Richard | Glascock | WM | Shawn | Burton | BM |
| 11/3/2009 | I2009-4277 | 2009-126203 | Jason | Roberts | WM | Lanuris | Hawkins | BM |
| | | | Jimmy | Christ | WM | | | |
| 3/26/2010 | I2010-4327 | 2010-30131 | Eliot | Young | WM | Harry | Porter | BM |
| | | | Kevin | Duncan | WM | | | |
| | | | James | Jenkins | WM | | | |
| 6/1/2010 | I2010-4352 | 2010-58207 | Walker | Johnston | WM | Carlos | Thurman | BM |
| 6/2/2010 | I2010-4351 | 2010-58506 | Arthur | McDaniel | WM | Millis | Farnam | WM |
| 12/9/2010 | I2010-4414 | 2010-135468 | Donna | Lesher | WF | Eugene | Ellison | BM |
| 4/16/2011 | I2011-4453 | 2011-38360 | Grant | Humphries | WM | Andrae | Lambert | BM |

EXHIBIT E

## LRPD USE OF DEADLY FORCE
## 2000-PRESENT

| Date of Incident | IA Number | Incident Number | OFFICER | | | SUSPECT | | |
|---|---|---|---|---|---|---|---|---|
| | | | OFC First Name | OFC Last Name | Race/Sex | SUS First Name | SUS Last Name | Race/Sex |
| 7/16/2011 | I2011-4484 | 2011-76010 | Robbie | Hinman | WM | Jacobe | Malone | BM |
| 7/18/2011 | I2011-4485 | 2011-76811 | Walker | Johnston | WM | Jerron | Taylor | BM |
| 12/8/2011 | I2011-4532 | 2011-133650 | Jason | Deno | WM | Christopher | Watkins | BM |
| 12/27/2011 | I2011-4540 | 2011-140828 | Christopher | Johannes | WM | Joseph | Williams | BM |
| 2/17/2012 | I2012-00005 | 2012-005828 | Jeff | Holt | WM | Angelo | Clark | BM |
| 5/22/2012 | I2012-00017 | 2012-054713 | Terry | McDaniel | WM | Charles | Murry | BM |
| 8/10/2012 | I2012-00033 | 2012-088290 | Matthew / James | Hoffine / Anderson | WM | Keith | O'Falon | WM |
| 8/12/2012 | I2012-00036 | 2012-088993 | Joshua | Hastings | WM | Bobby | Moore III | BM |
| 1/11/2013 | I2013-00009 | 2013-003902 | Todd | Hurd | WM | Michael | Daniel | BM |
| 3/21/2013 | I2013-00023 | 2013-029412 | Christopher | Bonds | BM | Randy | Crook | WM |
| 5/25/2013 | I2013-00020 | 2013-043445 | Stephen | Gorbet | WM | Kenzell | Hobbs | BM |
| 7/10/2013 | I2013-00045 | 2013-076689 | Eliot | Young | WM | Antoine | Wilbert | BM |
| 7/15/2013 | I2013-00033 | 2013-079092 | Terry | McDaniel | BM | Deon | Williams | BM |
| 10/13/2013 | I2013-00052 | 2013-116567 | Barry / Eric | Kingston / Hollister | WM | Jamye | Clayton | BM |
| 10/23/2013 | I2013-00064 | 2013-119369 | Roy | Williams | BM | Zachary | Long | BM |
| 11/14/2013 | I2013-00057 | 2013-129104 | Eric | Barnes | WM | John | Williams | WM |
| 1/29/2014 | I2014-00002 | 2014-010673 | Chance | Ketzscher | WM | Derrick | Hood | BM |
| 3/5/2014 | I2014-00011 | 2014-023579 | Paul | Evans | BM | Michael | McCormack | WM |
| 4/28/2014 | I2014-00018 | 2014-045932 | Jeffery / Scott / Jackie | Plunkett / Miles / Davidson | WM / WM / WM | Kordarrel | Brewer | BM |
| 7/1/2014 | I2014-00031 | 2014-073594 | Scott | Miles | WM | Patrick | Johnson | BM |
| 7/14/2014 | I2014-00019 | 2014-054242 | Scott | Stovall | WM | Juvon | Allen | BM |
| 10/28/2015 | I2015-00038 | 2015-123816 | Anthony | Moore | WM | Unknown | | BM |

**EXHIBIT E**

Stan Wilhite                    3/16/2016                         1

1                    THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF ARKANSAS
2

3      NIKITA HAWKINS, as Personal
       Representative of the Estate
4      of LANDRIS HAWKINS, deceased,              PLAINTIFF

5      vs.                             NO 4:15-CV-281-BSM

6      JAMES CHRIST and JASON ROBERTS,
       STUART THOMAS, in his individual
7      and official capacities and the
       CITY OF LITTLE ROCK, a municipality      DEFENDANTS

8
                VIDEOTAPED DEPOSITION OF STAN WILHITE
9                 TAKEN ON BEHALF OF THE PLAINTIFF
           ON MARCH 16, 2016 BEGINNING AT 11:49 A.M.
10                IN NORTH LITTLE ROCK, ARKANSAS
                  REPORTED BY SUSAN J. PYBAS, CCR
11

12

13     REPORTED BY SUSAN J. PYBAS, CCR
       VIDEOTAPED BY JOHN SIMS
14

15

16

17

18

19

20

21

22

23

24

25

**Professional Reporters**
800.376.1006
www.proreporters.com



EXHIBIT F

```
 1                         APPEARANCES

 2     On behalf of the PLAINTIFF:

 3     Michael J. Laux, Esquire
       LAUX LAW GROUP
 4     WALKUP, MELODIA, KELLY &  SCHOENBERGER
       650 California Street, 26th Floor
 5     San Francisco, California  94108
       415-981-7210
 6     mlaux@walkuplawoffice.com

 7     On behalf of the DEFENDANTS, JASON ROBERTS and The
       CITY OF LITTLE ROCK:
 8
       John L. Wilkerson, Esquire
 9     ARKANSAS MUNICIPAL LEAGUE
       P.O. Box 38
10     North Little Rock, Arkansas  72115
       jwilkerson@armi.org
11

12     On behalf of the DEFENDANT, JAMES CHRIST:

13     M. Keith M. Wren, Esquire
       M. KEITH WREN & ASSOCIATES LAW FIRM
14     9421 West Markham Street, #B
       Little Rock, Arkansas 72205
15     501-223-9736
       mkwren@aol.com
16

17     ALSO PRESENT:

18     Nikita Hawkins and Deshuna Hawkins

19

20

21

22

23

24

25
```

1    photographed it?

2    A    Basically, yes, at least one of us.

3    Q    Okay.  What's the purpose of having a witness

4    there for these actions?

5    A    Well, for one thing, like this case is seven

6    years old, if I had gone 10-7, you've still got

7    somebody there that can testify to this.

8    Q    10-7 means what?

9    A    Deceased.

10    Q    Okay.

11    A    Out of service.

12    Q    Thank you very much.

13         Out of service, right?  It technically means

14    "out of service," but it's used sometimes to -- it

15    means the person is deceased?

16    A    If I were to call you on the radio and say,

17    "We've got a 10-7 here," we've got a body.

18    Q    Did you ever hear anybody refer to Landris

19    Hawkins as a 10-7, if you recall?

20    A    No, sir.

21    Q    Okay.  Do you rem -- do you have a

22    recollection, Mr. Wilhite -- and I don't necessarily

23    expect you do, and I'm not suggesting you should --

24    but do you have a recollection of handling this

25    item?

EXHIBIT F

1   A    Of this knife that -- are you talking about

2   E11?

3   Q    Yes, sir.

4   A    No, sir, I don't.

5   Q    All right.  And did you understand this item to

6   be of any significance to the police-involved

7   shooting that preceded your involvement?

8   A    Okay.  Explain what you mean, sir.

9   Q    Item E11 is a small kitchen knife with possible

10  blood on it.

11  A    Okay.

12  Q    Was that a significant piece of evidence to

13  you, based on what you knew?

14  A    Okay.  Based on what I would knew -- based on

15  what I had been told or been explained on arrival on

16  the scene, and definitely had possible blood, yes,

17  it would be a piece -- a valuable piece of evidence.

18  Q    Do you remember if you learned whether or not

19  that knife, E11, was moved or touched by anybody

20  after the shooting but before your arrival?

21  A    That, I can't answer.

22       Department policy is once a crime scene is

23  established, nobody goes into the crime scene.

24  Everything is left alone.

25       Prior to my arrival, I can't testify to any

1   part of it.  After our arrival, that's what I can

2   testify to.

3   Q    Absolutely.  And I'm not asking you if you saw

4   someone move it.  What I'm asking you is a little

5   bit different.

6        I'm asking if you remember anyone telling you

7   that it was moved prior to you removing it yourself?

8   A    No.

9   Q    You don't recall that?

10  A    No, sir.

11  Q    If someone had told you that this bit of

12  evidence had been removed from where it originally

13  was, for whatever reason, if you had been told that,

14  is that the type of thing that you would include in

15  your report?

16  A    Well, what I would do or would have done, I

17  would have noted that this piece of evidence was

18  moved by Officer so-and-so, and then I would contact

19  that officer's supervisor and ask for a report as to

20  why it was moved.

21  Q    And do you recall doing that in this case?

22  A    No, sir, I don't.

23  Q    But what you're describing is your routine

24  custom and practice in such a situation.

25  A    That -- that's part of -- that's part of

**EXHIBIT F**

1    evidence processing, a scene processing.

2         For example, you -- you're -- you've got a

3    weapon involved.  Due to officer safety and public

4    safety, the weapon may need to be moved if it's in

5    arm's reach of -- of your suspect or whatever.

6         If that officer moves it, then on our arrival,

7    he would say, "Okay.  I had to move the weapon for

8    this.  I collected it prior for this reason here --

9    for my safety or for the safety of others."

10        Same thing here.  If this weapon or if this

11   knife, rather, had been moved by anybody there prior

12   to us, we -- standard procedure, we would have been

13   told, "Okay.  That knife has been moved."

14        Why?  Who moved it?  Where was it located?

15   That sort of thing.

16   Q    Got it.

17   A    Now.  That would --

18   Q    And so --

19   A    I'm sorry.

20   Q    If there's more to add, please, feel free.

21   A    All right.  That happened that many times in 23

22   years --

23   Q    Okay.

24   A    -- that I was there.

25   Q    And so would it be safe to say that, based on

**EXHIBIT F**



EXHIBIT F